**Dated: July 27, 2018**

**The following is ORDERED:**



TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

IN RE:

**OTHEL H. GAMBLE, JR.,**              **Case No. 16-80194**
                                        **Chapter 7**
          **Debtor.**

**PINNACLE AGRICULTURE
DISTRIBUTION, INC.,**
          **Plaintiff,**

**vs.**                                  **Adv. Case No. 16-8018**

**OTHEL H. GAMBLE, JR.,**
          **Defendant**.

**<u>MEMORANDUM OPINION</u>**

Plaintiff Pinnacle Agriculture Distribution, Inc. ("Pinnacle") seeks a determination that

Defendant Othel H. Gamble, Jr. should be denied a discharge of his debts pursuant to 11 U.S.C.

§ 727(a)(2)(A), (2)(B), (3), (4)(A), and (5). Alternatively, Pinnacle seeks to except his debt from

discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  A trial on the merits was held jointly with Pinnacle's adversary case against Othel Gamble's brother and business partner, Michael G. Gamble, Adv. Case No. 16-8017-TRC.  After careful review of the testimony and exhibits admitted, as well as the relevant legal arguments and authority, the Court finds that Pinnacle did not meet its burden of proof by a preponderance of the evidence, and Othel H. Gamble, Jr. is entitled to a discharge.  The Court also finds that Pinnacle failed to establish that its debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## I.      Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

## II.     Findings of Fact

Othel H. Gamble, Jr. ("Othel") is a resident of Spiro, LeFlore County, Oklahoma.[1]  At the time of trial, Othel was 72 years of age.[2]  He and his wife, Kay, have been married fifty-one (51) years.  Othel's career in farming began in 1965.  He farmed on his own for 10 to 15 years, and then joined his brother Michael G. Gamble ("Michael") in another farming operation.  This farming business operated as a general partnership known as Gamble and Gamble Cattle Co. ("G&G").  According to Michael, G&G made money but its income was reinvested back into the farming operation, with the exception of a one-time draw taken by each brother.  G&G never

---

[1]To the extent any facts are not separately set forth herein but are included in the discussion of conclusions of law, they are incorporated herein by reference as additional findings of fact.

[2]Othel suffers from a hearing loss and had great difficulty hearing and understanding questions presented to him at trial.

owned any land in its name, but farmed cropshares on 7,000 acres.[3]  Its primary crop was

soybeans, with some wheat as well.  Othel personally farmed approximately 2,000 acres. Othel

drives a 2004 Buick and has not taken a vacation in 35 years.  The last trip he made out of state

was 7 years ago to watch his grandson play in a ball game in Mississippi.  When asked what he

does for fun, Othel replied, "I work."

        Pinnacle sold farming products consisting primarily of seed, fertilizer and chemicals to

Othel for use in G&G and in his own personal farming operation.  The Gamble brothers

purchased these farming products at a farm store in Spiro, identified as "Sanders," which was

convenient to the location of the Gamble farming operations.  As long as the Gambles bought a

sufficient amount of  fertilizer, chemicals and other farm products, Sanders provided some of the

seed at no cost.  Apparently, Sanders was owned by Pinnacle, although the parties did not

provide any evidence regarding the corporate relationship.  Othel stated that he had never met

anyone from Pinnacle.  Pinnacle did not have a corporate representative present at trial nor did

anyone other than the Gambles testify about the Pinnacle account.  Pinnacle offered no evidence

regarding statements made or financial information provided to it by the Gambles.  Othel stated

that either he or Michael wrote checks to Sanders every Friday or as needed for chemicals,

fertilizer and seed purchased.  Othel's bank records included  approximately $52,454 in

payments to Sanders in the year preceding bankruptcy.  G&G's bank records indicate that it paid

Sanders $471,540 from April through November of 2015.[4]

---

[3]Othel described "crop shares" as an arrangement whereby the landowner receives 25% of the
gross revenues while the tenant farmer pays all expenses and receives the remainder of revenues.

[4]*See* Pl.'s Ex. 25.

The Gambles did not prepare their own tax returns or financial statements. Instead, they employed BKD, LLP accounting firm ("BKD") to review their bank records and prepare tax returns on behalf of themselves, their farming operations and G&G. Their relationship with BKD spanned 50 years. In their early years of farming, Kay Gamble kept a ledger of all business expenses. Michael also employed this practice of bookkeeping. At BKD's suggestion, the Gambles discontinued this practice, noted the purpose for each expenditure on their checks, and provided the bank statements and check copies directly to BKD. This was to provide more detailed information for preparation of audits of G&G and tax returns.

Othel banked at First National Bank in Ft. Smith, Arkansas ("FNB") and Spiro State Bank ("Spiro Bank"). He had a joint account with his wife, Kay, at FNB. This account was used for personal expenses as well as their farming operations. Othel also had a $600,000 operating line of credit with FNB, secured by a blanket lien on all assets, including real estate, crops, equipment, and cattle. This operating line was cross-collateralized with G&G assets and Mike Gamble's assets. Othel had an account at Spiro Bank which served as the depository account for his Social Security income. His wife, Kay, was also a signatory on this account. Kay had her own personal account at Spiro Bank for automatic deposits of her Social Security income.

Othel testified that all of his income was deposited into either Othel's FNB account or his Spiro Bank account. Othel and Kay used income for personal living expenses and to pay bills of the farm operations. Most deposits in their FNB joint account were noted by the phrase, "Adv." or "trsf", apparently an abbreviation meaning the deposits came from an advance or transfer on the lines of credit with FNB. When funds were needed, Othel called FNB to request funds, and a bank employee would advance funds on the line of credit into his checking account or the G&G checking account. Corroborating this testimony were deposit slips for Othel's FNB account, the

G&G account, and Michael Gamble's FNB bank records. These deposits slips appear to be counter deposit slips, lacking a preprinted account holder name, address and account number. The counter deposit slips were in handwriting that differed from Kay or Othel's handwriting. The slips included Othel's name and account number, along with notations "Adv." or "Transf." As for income from the sale of crops or other transactions, Othel stated that he took those funds to FNB and the funds were deposited to reduce the line of credit. Othel was supposed to pay FNB the entire balance due on the $600,000 line of credit each year. He was not able to do that. Any interest he paid on the line of credit was deductible on his income tax return but not the payments on the line of credit.

Checks written on the FNB joint account included a brief description in the Memo line of what the payment was for, such as "farm fuel," "farm equip. repair," "farm supplies," insurance premium, utilities. Kay wrote most of the checks. Othel and Kay also had automatic drafts in place for cell phone bills, utilities, and taxes. Checks written to Othel's children, grandchildren and other persons were for wages with deductions for federal and state payroll tax noted on the Memo line. When making monthly payments on their credit cards, the Gambles wrote separate checks to the credit card company, one noting that it was for farm-related charges and one noting that it was for personal expenses.[5] The FNB account incurred numerous overdraft and NSF charges, some of which were later reversed by the bank.

G&G also had a checking account at FNB. Othel and Michael were signators on this account. Bank statements from April 1, 2015 through May 31, 2016 reflected check-writing practices nearly identical to those of Othel and Kay's, and Michael's bank accounts. Checks included notations on the memo line of the type of expense being paid, such as fuel, repairs,

_____

[5]*See e.g.* Pl.'s Ex. 9-174-75.

payroll, or equipment. Michael estimated that some months, fuel costs were $20,000. Monthly payments were made electronically for utilities and to the IRS. Payments to the IRS ranged from $2300 to $5000 each month. Large deposits were made into this account with the notation "Adv". Other deposits were identified as proceeds from crop or livestock sales, or insurance claims. Payments to Pinnacle's store, Sanders, were made from this account ranging from approximately $14,000 to $180,000 a month. Payments to Sanders drastically decreased to $2400 in October 2015 and ceased thereafter. No draws or payments were made on this account to Othel or Michael until January and February of 2016. Twenty thousand dollars each was transferred to Othel and to Gamble Farms (Michael's farming operation) in January 2016. An additional $20,000 was transferred to Othel's FSB account in February. These transfers are reflected in their personal bank accounts.

The Gambles' farm operations suffered through multiple years of drought which strained their financial resources. In 2015, they experienced contrary weather conditions: devastating floods. Othel and G&G lost a combined total of over 10,000 acres of soybean and wheat crops. The first flood occurred approximately May 20, 2015. Othel carried crop insurance through Liberty Mutual Insurance Co., so he made a claim of $53,042 against this insurance on May 29, 2015. He received payment in that amount and deposited those funds into his FNB bank account on September, 1, 2015.[6] The notation on the deposit slip reflected that the funds were for "Flood damage."

Another storm and flood occurred approximately October 15, 2015. Irrigation equipment was damaged and Othel made a claim of $1700 for that loss.[7] He deposited $1700 into his FNB

---

[6]Pl.'s Ex. 9-113.

[7]Pl.'s Ex. 16.

account January 29, 2016.[8]  Othel replanted and lost his second crop due to a flood in December

of 2015.  Besides losing crops in the field, irrigation equipment and a combine were severely

damaged by the December floods.

In the midst of these floods, crop failures and loss of equipment, Pinnacle filed a

collection action in federal court, the Eastern District of Oklahoma, against Othel, Michael, and

G&G.  On December 8, 2015, Pinnacle obtained a default judgment against Othel Gamble

individually in the amount of $802,446.73 plus attorneys' fees, costs and post-judgment interest.[9]

A default judgment was also entered against Othel and Michael jointly and severally in the

amount of $567,378.61 plus attorneys' fees, costs and post-judgment interest.  Pinnacle's total

judgment against Othel was $1,369,825.34.  The judgment did not contain any language

suggesting defalcation or fraud.  In February of 2016, Pinnacle garnished the FNB bank accounts

of Othel and Kay, Michael Gamble, and G&G for approximately $222,000.[10]  From that time on,

Othel no longer used the joint FNB account.  He considered the account closed because of the

garnishment, believing that there were no funds in the account.  Instead, he began to use his Spiro

Bank account.  He and Kay also used her personal account at Spiro Bank.  Bank records from

Kay's Spiro account indicate that she began making direct electronic payments from this account

to certain creditors around the time Othel filed for bankruptcy.

---

[8]Pl.'s Ex. 9-205.

[9]*See* Attachments to Pinnacle's Proof of Claim 11-1, filed June 23, 2016.  The judgment actually
states that is entered "in favor of" Othel and Michael jointly and severally.  Apparently this was a
typographical error.  Pinnacle's Proof of Claim treats this as a joint and several judgment against
Othel and Michael.

[10]Pl.'s. Ex. 1-035, Case No. CV-16-75-S, Circuit Court, Sebastian County, Arkansas.  The
bankruptcy trustee later recovered these funds through a preference action, Case No. 17-8007.

The garnishment was the tipping point prompting the Gambles to seek bankruptcy protection. Othel, Michael and G&G each filed bankruptcy under Chapter 12 on March 4, 2016. In filing bankruptcy, the Gambles hoped to obtain an extension on their line of credit with FNB or secure a new line for $1,000,000. The Gambles hoped to reorganize and continue farming, however they were unable to secure additional funding. On June 16, 2016, they converted their cases to Chapter 7. Gerald Miller was assigned as the Chapter 7 Trustee ('Trustee") for all three Gamble cases. Pinnacle timely filed its proof of claim in Othel's case on June 23, 2016, Claim No. 11, in the amount of $1,371,588.47.[11]

Othel filed his schedules and Statement of Financial Affairs ("SFA") three weeks after filing his petition. To these he attached a copy of his 2015 Form 1040 U.S. Individual Tax Return with Schedule F Profit or Loss From Farming, and a detailed list of farm equipment owned. His reported adjusted gross income for 2015 was $619,663, and federal income tax owed was $202,751.[12] Schedule F of his tax return reported crop insurance proceeds of $168,566.[13] On Schedule D in his bankruptcy, Othel listed secured claims of $430,000 on a judgment lien of Farmers Cooperative, $3000 to Ford Credit for a Ford truck, a claim of unknown value held by John Deere Financial for a "header," a claim for $466,000 to FNB for a blanket lien on all crops, equipment, accounts and cattle that was cross-collateralized with G&G assets and Michael's assets, and Pinnacle's claim for its judgment lien valued at $1,200,000.[14] He reported a priority

---

[11]Pinnacle also filed a proof of claim in this amount in the G&G case. Pinnacle filed a proof of claim in Michael's case in the amount of $568,108.90.

[12]Pl.'s Ex. 1-029-30.

[13]Pl.'s Ex. 1-031.

[14]Pl.'s Ex. 1-014-16.

unsecured claim for 2015 taxes owed to the IRS for $202,751, $26,000 owed to the Oklahoma Tax Commission for 2015 income taxes, and nonpriority unsecured claims of various other business creditors including $10,000 owed for crop insurance premiums. Total nonpriority unsecured claims were $250,031. In his SFA, he reported gross income through the date of filing at $530,000. He listed payments made within 90 days of filing to Farm Credit for $1000 per month, and $495,000 to FNB in January 2016. He listed two pending lawsuits: Pinnacle's garnishment action in Arkansas, and a collection action dating from 2013 by Farmers Coop in LeFlore County, Oklahoma.

In preparing his schedules and SFA, Othel drew from his memory to identify creditors, transfers, assets, and insurance. He also provided his attorney with his 2015 tax return. Othel always kept a running account in his mind of approximately how much he owed to his creditors and what payments he had made. At trial, Othel did not recognize nor recall reviewing his bankruptcy schedules before signing; however, he acknowledged that he signed his bankruptcy schedules under penalty of perjury.

His schedules did not identify his wife's checking account at Spiro Bank. Othel did not list Kay's Spiro account, believing he had no interest in her account because he had no authority to sign checks. Othel also did not list payments totaling at least $6225 made in the 90 days preceding the filing date. He admitted that monthly payments of $3277 to Liberty Mutual Insurance Co. to insure irrigation equipment were not included, nor were $600/week payments to hired hand Ricky DeShazo, payments to Grissom's LLC, nor payments on his Discover credit card. Wages paid to insiders, including his son, daughter-in-law, grandchildren and niece for work performed in his farming operations were not listed on his SFA. Othel explained that he did not list these payments because they were not debts he owed. Christmas gifts of $300 each

were also made by Othel and Kay Gamble to their grandchildren; however, those gifts were not listed in the SFA.[15]

In answering question 31 of his SFA, Othel disclosed that he owned five life insurance policies with his spouse as the beneficiary. He provided no further details such as the names of the insurance companies or the value of each policy. He did not provide this information when he amended his schedules. In response to inquiries from the Trustee, Othel disclosed the details of these policies. Othel had a $200,000 life insurance policy with Prudential Insurance, obtained in 1989.[16] He, or his wife Kay, made premium payments monthly on this policy. Kay and Othel received $95,090.57 in a sale of accumulated stock from this policy on April 22, 2015, and deposited it into their joint FSB account because that was the bank that financed his farming operations.[17] According to Othel, FSB applied most of that money against his line of credit and advanced $20,000 into their checking account. The bank statement corroborates his testimony as it reflects a deposit of $20,000 on May 11, 2015.[18] In December of 2015, Kay received a dividend payment of $25,493.55 from the Prudential policy.[19] She deposited this payment into her Spiro account.

---

[15]Pinnacle's attorney prepared a spreadsheet of payments made to insiders from the Gambles' bank accounts at FNB and Spiro Bank, and submitted this as a demonstrative exhibit to the Court. During the two years preceding Othel's bankruptcy, Pinnacle calculated that these payments totaled $55,686.97.

[16]Pl.'s Ex. 18.

[17]Pl.'s Ex. 24.

[18]Pl.'s Ex. 9-029. The deposit slip for this item also appears to have been filled out on a counter form by someone other than Kay or Othel, and is in the same handwriting as the other deposit slips noted as "Adv."

[19]Pl.'s Ex. 23.

Othel also disclosed to the Trustee that he had two policies with Bankers Life and Casualty Company. One policy, obtained in 1990, was for $250,000. He was the owner and insured, and Kay was beneficiary.[20] He had another policy with Bankers Life for $200,000 obtained in 1995, of which Kay was the owner and beneficiary.[21] Othel and Kay borrowed against these policies in late March of 2015. Checks were made to Kay totaling $46,930.14 and were deposited into their joint FSB account.[22] Othel did not disclose receipt of these funds in his bankruptcy schedules, explaining that he didn't know he needed to disclose them. Othel provided information to the Trustee that he and his brother Michael were the owners of a $100,000 policy insuring their mother, Margaret Gamble.[23] This policy had a cash value of $67,978.16 when they filed bankruptcy.

Othel and Michael were beneficiaries of their parents' trusts, although they both testified they were not aware of their interest in the trusts prior to the bankruptcy. Their beneficial interests in the Othel H. Gamble, Sr. Trust and the Margaret Gamble Trust were not disclosed in their schedules or the SFA.[24] Othel testified that he knew his parents had trusts, but he did not know he was a beneficiary nor did he know anything about the assets or operation of the trusts.

---

[20]Pl.'s Ex. 19.

[21]Pl.'s Ex. 20.

[22]Pl.'s Ex. 9-0007. The deposit slips for these checks appear to have been filled out on a counter form by someone other than Kay or Othel, and are in the same handwriting as the other deposit slips noted as "Adv."

[23]Pl.'s Ex. 17.

[24]G&G's schedules included references to the Othel and Margaret Gamble Trusts. *See* Pl.'s Ex. 3-014, 018. Michael's schedules also referenced these trusts.

He described his mother as someone who did not "advertise her business." Michael also described their mother as someone who did not tell others her business, including him.

Their father, Othel Sr., died many years prior to them filing bankruptcy. After their father's death, their mother Margaret became the successor trustee of Othel Sr.'s trust. In 2010, Margaret appointed Othel and Michael as co-successor trustees of Othel Sr.'s trust and her own trust.[25] Othel testified that he was not aware of this. After Othel and Michael filed bankruptcy, their mother, Margaret Gamble, named Othel's wife Kay as a successor trustee of her trust.[26] Margaret died in January of 2017 and Kay was appointed trustee of the Othel Sr. trust. The order appointing Kay entered by the LeFlore County District Court stated that Othel Jr. and Michael has executed waivers and consented to her appointment.[27] Othel received distributions from his mother from her trust bank account which he stated were gifts that he used for living expenses. He acknowledged that he did not list these gifts in his schedules or SFA.

In response to Question 15 in the SFA regarding losses from theft, fire, other disaster or gambling, Othel disclosed that he had crop losses from floods in May and December of 2015 of an unknown value. He did not specifically list the pending claims against insurance as requested in that question, nor did he list pending insurance claims on line 33 of Schedule A/B: Property. He did not list the insurance claim proceeds received before filing bankruptcy, although the amount he received was listed in his 2015 Federal Income Tax Return attached to his bankruptcy petition.[28]

---

[25]Pl.'s Ex. 27.

[26]Pl.'s Ex. 31.

[27]Pl.'s Ex. 28.

[28]G&G identified a crop insurance check for $40,600 in its Schedule A/B. *See* Pl.'s Ex. 3-003.

After filing, Othel received two payments for 2015 flood damage claims made before he filed for bankruptcy. On March 8, 2016, just days after he filed bankruptcy, Othel deposited $14,118.92 on a crop insurance claim into his Spiro Bank account.[29] Several days later, these funds were transferred into Kay's Spiro Bank account.[30] In April of 2016, he received a payment of $38,630 for damaged irrigation pivots. This check was deposited into his Spiro Bank account on April 15, 2016, with the intention to then transfer to Kay's bank account so that she could write checks and keep paying bills.[31] On April 20, 2016, these funds were transferred to Kay's Spiro account.[32] On April 11, 2016, he was paid $67,591 for the loss of the combine.[33] He turned over this check to the Trustee.

As reported on Schedules I and J, the Gamble farming operations involved large sums of money. Estimated monthly farm income was $78,570. Monthly farm expenses were $25,049.00, with total expenses of $39,499, including $3300 for property insurance. The bank records and tax returns of Othel Gamble and G&G confirm that large sums of money flowed through their bank accounts. As Othel explained, he would call FNB for an advance on his or G&G's line of credit, the money would be transferred or advanced into his joint checking account or G&G's account, and any income he received would be deposited at FNB and applied to the line of credit. No evidence was presented to refute his testimony, and his bank records as well as G&G's

---

[29]Pl.'s Ex. 10-035.

[30]Pl.'s Ex. 11-034. A handwritten notation on the bank statement reflects that this payment was for prevented planting.

[31]Pl.'s Ex. 10-037; Pl.'s Ex. 14-002.

[32]Pl.'s Ex. 11-050. The deposit slip for this transfer appears to have been filled out on a counter form by someone other than Kay or Othel.

[33]Pl.'s Ex. 14-003.

confirmed that advances and transfers were deposited into the FNB accounts. The handwriting on these counter deposit slips differed from that of Michael, Othel and Kay. Regardless of which Gamble entity account the advances were deposited, the handwriting of each deposit slip was the same, indicating that the same FNB employee or officer handled the advances from their lines of credit into the Gambles' various accounts. Bank records also reflected monthly farming and personal expenses, providing a sufficient explanation to the Court of where monies were spent. Bank records also reflected a lack of income other than through draws from their line of credit, or social security income deposited into Othel's Spiro account.

Othel amended his schedules twice after filing. As with reviewing and signing his original schedules and bankruptcy petition, Othel did not recall reviewing the amendments before filing with the Court. On September 2, 2016, he amended Schedules A/B, C, D, E/F and G and the Matrix.[34] He included legal descriptions of real estate, added exemptions, changed valuations of assets and debts and added creditors and addresses. He amended his schedules again on September 5, 2017, in response to an agreement with Trustee regarding certain real property Othel claimed as exempt.[35] Othel added a tract of real property to Schedule C that had not been listed previously. Trustee objected, claiming Othel had acted in bad faith in failing to disclose this tract on which his ranch hand lived.[36] Othel responded that he'd believed this one-acre tract was included in the legal description on an adjoining 59 acre tract and only discovered the error in trying to carve out the homestead acreage to exempt. He informed the Trustee early in the

---

[34]Pl.'s Ex. 2.

[35]Pl.'s Ex. 48.

[36]Case 16-80194 Docket Entry 222.

case that his farm homestead included a house occupied by his ranch hand.[37]  Ultimately, the

Trustee withdrew his objection and Othel paid the estate $7500 to resolve this issue.[38]  Neither of

these amendments to Othel's schedules included details regarding his interests in the life

insurance policies and cash withdrawn, payments made to insiders prior to filing, nor receipt of

crop insurance proceeds.

Trustee Gerald Miller testified on behalf of the Gambles.  Miller has been a chapter 7

trustee for 25 years.  He estimated that he has administered over 75,000  cases.  A typical chapter

7 case is a consumer case with primarily credit card debt.  However, the Gamble cases fell into a

different category of business cases to which Miller devotes special attention.  In such cases, he

sends a letter to a debtor's counsel requesting bank records, titles, mortgages and deeds, financial

records and a request for a 2004 exam.  He requested those items in this case and conducted 2004

exams of Othel, Michael, and their wives.

The cases also garnered extra attention from the Trustee because Othel and Michael filed

as individuals, not jointly with their wives.  The Trustee looked for transfers of property to

spouses.  The Gambles provided bank statements and checking account registers.  Their non-

filing spouses also cooperated fully with him.  The business records provided contained adequate

information by which the Trustee was able to investigate and track financial affairs dating back a

number of years before bankruptcy.  The Trustee noted that there were some checks that were not

payable to the debtors so the funds could have been converted to their personal use without the

Trustee knowing about them.  However, the debtors voluntarily turned these over to him without

a special request.  Debtors also voluntarily turned over $100,000 to the Trustee prior to their 341

---

[37]Case 16-80194 Docket Entry 224.

[38]Case 16-80194 Docket Entry 261.

meetings without any request of the Trustee. Despite an investigation, the Trustee found no suspicious transfers of assets, no attempts to hide assets, no purchases of luxury items or inappropriate expenditures by the Gambles. Instead, he determined that their expenditures were for typical living expenses and farm expenses.

The Trustee testified that he became aware of the Othel Sr. and Margaret Gamble Trusts very early on during his involvement in the Gamble cases. He stated that the existence of the trusts was never hidden from him but that the assets in the trust were not assets that he could obtain for the bankruptcy estate. He examined the trust documents and did not find them unusual.

The Trustee received crop insurance proceeds of $40,687 in July of 2016 from a claim made by G&G. He also received the proceeds of the combine claim made by Othel of $67,591. Sale of Othel's equipment at public auction generated $280,500 for his bankruptcy estate.

At the time the cases converted to Chapter 7, Kay had approximately $25,000 in her Spiro Bank account. The Trustee investigated the origin of these funds and determined that they had been transferred to her account from Othel prior to filing bankruptcy. Some of those funds were used for farming operations prior to conversion. The Trustee was satisfied with Othel's explanation for transferring to Kay's account that they had used her account since his FSB account had been garnished. Some of these funds were used for personal expenses. He reached a compromise with Kay for her to pay $15,000 to Othel's bankruptcy estate based on his review of the type of expenses paid prior to conversion.

In examining the debtors' schedules, the Trustee stated that he found them adequate when initially filed. Due to the volume of assets, large area involved, and size and complexity of the operations he believed these to be difficult cases to identify all assets and transactions. Any

omissions were adequately explained and corrected. The Trustee described both Othel and Michael Gamble as candid and very cooperative. They responded promptly to his requests for information and he believed them to be truthful and honest in their dealings with him. Because there were three related cases, the Trustee reviewed tax returns and depreciation deductions to identify ownership of some of the farm equipment. This equipment was spread out over a 900 square mile area. The Gambles assisted the court-appointed auctioneer in gathering all equipment for sale by accompanying the auctioneer throughout their property to locate and identify all items to be sold. The Trustee believed that some equipment may not have been located had it not been for the assistance and full cooperation of the Gambles. He stated several times during his testimony that he could not have located all assets and collected funds without the full cooperation of the debtors. He declined to bring a § 727 action against either Othel or Michael, finding no basis for him to file any action against them.[39]

The Court finds Othel and Michael to be credible witnesses. They gave a very good overview of their business operations, although they were generally unable to provide detailed information about specific purchases and identify exact amounts spent. Keeping a running account in his mind of debts owed, Othel knew what funds were needed to service his line of credit. Both debtors repeatedly stated that a review of their bank accounts would yield an accurate picture of their farming income and expenses. They certainly knew about their farming operations: the planting of crops, the equipment they used, the weather conditions, the acreage they farmed, insurance, their banking relationships, and the mechanics of raising cattle and chickens. They also explained the procedure for obtaining and making claims on crop insurance

---

[39]The Trustee did file an adversary proceeding against Pinnacle (Case No. 17-8007) to avoid Pinnacle's lien on the garnished funds. Pinnacle consented to avoidance of its lien.

and for prevented planting, distinguishing them from general property and casualty insurance. Prevented planting payments as well as crop insurance did not begin to cover total losses. The Court finds their explanations of their farming operations and their statements that income generated from these operations was used to pay down their lines of credit and was invested back into their farms to be truthful. Their testimony revealed no hints of fraudulent intent to conceal assets, failure to disclose information in their schedules, nor any intent to mislead or defraud their creditors. On the contrary, the Court finds that their sole goal in the year leading up to filing bankruptcy was to continue their farming operations in an effort to generate sufficient income to pay their creditors and prevent bankruptcy. They tapped every resource available, including life insurance, to continue farming.

Pinnacle characterized the Gambles and their farming operations as "sophisticated," emphasizing the fact that they farmed thousands of acres and generated millions of dollars in annual revenue. However, the Court does not believe that characterization is accurate. While their farming operations were sizable, size alone does not equal sophistication. The Court believes that the Gambles' area of expertise is in farming, gained through decades of experience. However, their business records, while detailed, were bank statements, not a sophisticated accounting system. Until a few years ago, they used handwritten ledgers to track expenses. They relied on BKD, providing their bank records to it to review and prepare basic financial statements and tax returns from those records.

The Gamble brothers are not sophisticated nor highly educated. They have been farmers in Spiro, Oklahoma all of their lives. Their inability to recall and offer detailed explanations regarding financial transactions while farming thousands of acres does not seem unusual or inconsistent to this Court. Nor does it indicate a scheme designed to defraud their creditors. The

fact that the Gambles hired BKD, a professional accounting firm, to prepare tax returns is consistent with their testimony and the Court's belief that their expertise was in farming. Employing BKD to provide accounting services seems a prudent course designed to allow the Gambles to do what they do best — farm. They did not, however, shirk their responsibilities to creditors to prudently manage their farming operations and be aware of their financial condition. Although they did not give exact amounts of their business income and expenses, they knew approximately how much income their farming operations generated and the monthly costs associated with those operations. The Court finds that they provided adequate explanations of how their money was spent. They identified insurance payments, they identified the work performed by others, they were well-informed about crop insurance, how it operated, the companies that insured them, the property that was damaged and the claims that were made. The Court did not detect a fraudulent intent, nor a cavalier attitude regarding disclosures of assets, expenditures, or transfers to relatives.

### III. Conclusions of Law

**A.    Denial of Discharge.**

  **1.    Standard for Nondischargeability.**

Debtors seek bankruptcy protection for a variety of reasons, but primarily they do so to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[40]   This is why denial of a debtor's discharge is an extreme step. The protections of the Bankruptcy Code are to be construed liberally in favor of the debtor and strictly against the

---

[40] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934).

creditor.[41]  The party objecting to discharge has the burden of proving by a preponderance of the

evidence that grounds exist supporting the denial.[42]  Pinnacle seeks to deny Othel Gamble  a

discharge on four different grounds: § 727(a)(2)(A) and (B) for fraudulent concealment and/or

transfer of property of the debtor or estate; § 727(a)(3) for failure to keep and preserve adequate

records regarding debtor's financial condition or business transactions; § 727(a)(4)(A) for

knowingly and fraudulently making a false oath or account; and § 727(a)(5) for failure to explain

satisfactorily any loss or deficiency of assets to meet the debtor's liabilities.  The Court will

address each separately.

### 2.  § 727(a)(2)(A) and (B): fraudulent concealment and/or transfer of property.

To deny Othel Gamble's discharge under this section, Pinnacle must prove that Othel

either personally or allowed someone else to transfer, remove, destroy, mutilate or conceal his

property or property of the bankruptcy estate with the intent to hinder, delay or defraud a creditor

or officer of the bankruptcy estate.  The time period to review is one year prior to filing the

bankruptcy, and after the date of filing.  The United States Supreme Court calls this subsection "a

blunt remedy for actions that hinder the entire bankruptcy process . . . ."[43] The "intent" element

of this section must be an actual intent to defraud creditors.[44]  Actual fraudulent intent may be

---

[41].*See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997);  *Bank One v. Kallstrom (In re Kallstrom*), 298 B.R. 753 (10th Cir. BAP 2003).

[42] Fed. R. Bankr. P. 4005; *Mathai v. Warren (In re Warren)*, 512 F.3d 1241 (10th Cir. 2008); *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156 (10th Cir. 1991).

[43]*Husky Int'l Electronics, Inc. v. Ritz,* 136 S. Ct. 1581, 1589 (2016).

[44]*Warren*, 512 F.3d at 1249, *citing Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

established through circumstantial evidence as well as inferences from a debtor's conduct.[45] Although a single wrongful act or omission may be sufficient to prove actual intent, "evidence of a pattern of wrongful behavior presents a stronger case."[46]  In other words, courts should consider a debtor's "whole pattern of conduct."[47]  Concealment is defined as hiding property or withholding information about an asset that the law requires be disclosed.[48]

The Court does not believe that Pinnacle met its burden of proof to deny discharge on this ground.  When the Court reviews the "whole pattern of conduct," it concludes that the evidence does not indicate an intent to defraud.  There was no evidence that Othel Gamble intentionally concealed or transferred property with the intent to defraud Pinnacle, the Trustee, or other creditors.  Nothing in Othel's lifestyle suggests that he had more income or assets than what he disclosed or the Trustee discovered.  He had a large amount of farm equipment but none of his vehicles were new.  To the contrary, all but one were more than ten years old, all with mileage over 100,000 miles. His personal vehicle was 14 years old with 204,000 miles.  His lifestyle was not extravagant nor luxurious in any way.

None of the badges of fraud are present here.  There was no evidence of deliberate concealment, no allegations or evidence of conversions or transfers of assets to insiders without consideration, no allegations or evidence of gratuitous transfers of assets, no transfer of assets on

---

[45]  *Warren,* 512 F.3d at 1249, *citing Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[46]*Freelife, Internat'l LLC v. Butler (In re Butler)*, 377 B.R. 895, 916 (Bankr. D. Utah 2006) quoting *E. Diversified Distr., Inc. v. Matus (In Re Matus)*, 303 B.R. 660, 672 (Bankr. N.D. Ga. 2004).

[47]*Matus,* 303 B.R. at 672.

[48]*See McDermott v. Recupero (In re Recupero),* 2014 WL 1884331, at *7 (Bankr. N.D. Ohio 2014).

the eve of bankruptcy in an attempt to keep them out of the estate, no allegations or evidence of a lack of cooperation with the Trustee.[49] Although the parties were engaged in lengthy discovery disputes regarding business records, these records were readily provided to the Trustee and were ultimately produced to Pinnacle. The Gambles made several offers to sit down with Pinnacle to review financial records. Ultimately, this is what the Court ordered the parties to do. The Court also sanctioned the Gambles for their delay and awarded Pinnacle $2000 for attorney fees from each defendant. In presiding over these discovery disputes, the Court did not believe that the Gambles' delay was part of a plan to defraud Pinnacle.

Regarding his interest in his parents' trust, Othel answered "No" when asked about any interest in property due from someone who has died (question 32 on Schedule A/B). However, the existence of the trusts became known to the Trustee early on during the case. Othel's explanation that he did not know he needed to disclose trusts of his parents and that he did not know he was a beneficiary is credible and sufficient to this Court. These trusts were identified in the G&G schedules and in Michael's schedules. Pinnacle was a creditor in those cases. Pinnacle attended the 341 meetings and the 2004 exams of Michael and Othel. The Court finds no intent to conceal the existence of these trusts in an effort to mislead or defraud Pinnacle or any other creditor.

Othel did not list any of his insurance claims on Schedule A/B. However, he did list crop losses due to floods in May and December of 2015 in his SFA. The Court concludes that this is a sufficient notice of potential insurance claims, and is evidence that he did not intend to conceal the insurance proceeds from creditors. Likewise, although he did not give detailed information about his life insurance policies as requested in question 31 of Schedule A/B, he did disclose that

---

[49] *See e.g. Phillips 66 Co. v. Ritchie (In re Ritchie),* 543 B.R. 311, 321 (Bankr. D. N.M. 2015).

he was the named insured on five life insurance policies. The Court concludes that this is sufficient notice and does not establish concealment of these interests from creditors sufficient to support a denial of discharge.

As the Court has found Othel's testimony to be credible and unrefuted, it cannot infer from Othel's conduct or testimony that he engaged in a pattern of wrongful conduct with the intention of misleading Pinnacle in an effort to defraud it. Instead, the evidence established that any transfers to insiders were for wages earned with appropriate payroll taxes withheld and remitted, that claims against insurance for flood damage and lost crops were listed, deposits and use of bank accounts were explained, answers were provided for questions raised. Construing this exception to discharge narrowly, and resolving any doubt in Othel's favor, the Court concludes that discharge should not be denied on this ground.

**3.    § 727(a)(3): failure to keep and preserve adequate records.**

To establish a prima facie case under this section Pinnacle must show that Othel "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material* business transactions."[50] If Pinnacle meets this initial burden, it shifts to Othel to justify his failure to maintain records. The scope of a debtor's duty to maintain adequate records depends on the nature of his business and the facts and circumstances of each case.[51] Records need not be so complete as to detail all or substantially all transactions that took place. They need only be sufficient to allow an intelligent inquiry.[52] Unlike other exceptions to

---

[50]*The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001)(quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997)),*aff'd*, 35 Fed. Appx. 811 (10th Cir. 2002).

[51]*Martinez v. Sears (In re Sears)*, 565 B.R. 184 (10th Cir. BAP 2017).

[52]*Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711 (Bankr. D. Colo. 2013).

discharge, no proof of a debtor's intent to defraud or conceal is required.

Pinnacle did not establish a prima facie case under this subsection. Othel and Kay Gamble provided bank records for multiple accounts dating back a year prior to filing through May or June of 2016. These records include copies of checks written on their accounts, primarily their joint FNB account. Kay wrote checks to pay wages from this account, noting withholding of employment taxes in the memo line. Most checks included a brief description in the memo line of the purpose of the payment. Monthly payments on credit cards were made separately for farm expenses, fuel and personal expenses with the identifying account number written on each check. Payments for personal expenses were also explained, such as medical bills, magazines, food, and membership in farming organizations. Monthly statements listed automatic drafts for telephone accounts, utilities, IRS payments, and insurance premiums. Deposits were identified as advances into the account, as sales of crops, or as insurance proceeds. There were numerous overdraft charges on the FSB account.

Bank records of G&G were also submitted to the Court. Checks written on that account included brief descriptions of the expense, such as fuel, repairs, machinery purchased, repair parts, and labor. Large advances were deposited into the G&G account, but monthly expenses were approximately equal to monthly advances deposited into that account. The Court concludes that the records were adequate to inform creditors and the Trustee what operations were conducted by the Gambles and G&G. The bank records, insurance documents, trust information and tax returns enabled creditors to ascertain Othel's financial condition and material business transactions. The evidence does not support denial of discharge on this ground.

**4.      § 727(a)(4)(A):  knowingly and fraudulently making a false oath or account.**

Debtors have a duty to carefully, completely and accurately prepare schedules. The

purpose of § 727(a)(4) is to enforce this duty. A debtor must provide sufficient information and details to enable the trustee to determine whether to investigate further.[53] To deny a discharge under this section, a court must determine that the debtor acted knowingly and fraudulently in making a statement or omission under oath, and that the statement or omission is material to the case. The standard of materiality is low, encompassing anything that bears a relationship to a debtor's business transactions or discovery of his assets.[54] However, a false statement based upon a mere mistake or inadvertence is insufficient to deny a discharge. The statute requires a knowing and fraudulent false oath. In determining fraudulent intent, courts look to the facts and circumstances of each case.

Pinnacle argues that Othel knowingly and fraudulently made a false oath or account and knowingly withheld information from his bankruptcy schedules regarding assets, including crop insurance claims and proceeds, life insurance payments, his wife's Spiro bank account, payments to insiders, and interests in his parents' trusts. However, even if the Court assumes the omissions were material, it is not enough that Pinnacle identify inaccuracies and inconsistencies in Othel's schedules. To deny his discharge under § 727(a)(4)(A), the Court must find that Othel omitted information with an intend to defraud and mislead his creditors.[55]

The Court finds that Pinnacle did not meet its burden to deny discharge by a preponderance of the evidence. The Court finds and concludes that any omissions from Othel Gamble's schedules were innocent, not deliberate, and therefore did not meet the knowing and

---

[53]*Hermann v. Hartford Casualty Insurance Co.*, 675 Fed. Appx. 856, 860 (10th Cir. 2017) (unpublished), citing *Payne v. Wood*, 775 F.2d 202, 205-206 (7th Cir. 1985).

[54]*In re McNally*, – Fed. Appx. – , 2018 WL 2974411 *4 (10th Cir., June 13, 2018), citing *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990).

[55]*See McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 242 (Bankr. D. Colo. 2005).

fraudulent standard of § 727(a)(4). Othel's schedules disclosed that he suffered two crop losses and included dates of the losses. He attached a copy of his tax return to his bankruptcy petition, which included the amount he was paid in 2015 in crop insurance proceeds. This does not support Pinnacle's claim that Othel's failure to include detailed information regarding insurance claims and crop insurance proceeds was designed to hide information, thereby misleading and defrauding his creditors. He attached a detailed list of farm equipment owned. He disclosed that he carried life insurance. Although he did not list his interest as a beneficiary of his parents' trusts, his explanation that his mother did not provide detailed information regarding her financial dealings, and that he did not know he was a beneficiary was a credible explanation of the omission. His schedules provided sufficient information to enable the Trustee and creditors whether to investigate further.

The Court does not believe that Othel intended to conceal his wife's separate bank account to defraud his creditors. His testimony that he believed his FSB account was no longer available to him because Pinnacle had garnished all funds from it was credible. His explanation that he did not list his wife's personal account because she was not a debtor and he was not a signatory on it was sincere, even if incorrect. Kay's social security checks were deposited into her separate Spiro account. Othel's social security checks were deposited into their joint account at the Spiro bank. The crop insurance payments received post-filing were deposited into Othel's Spiro account, an account that was identified in his bankruptcy schedules. From the Court's review of Kay's Spiro bank account records, Kay and Othel did not primarily use her account to pay personal and farming expenses until after he filed bankruptcy. After filing, Othel did transfer funds to Kay's Spiro account and she used the funds to pay farm-related expenses as well as personal living expenses. This is consistent with Othel's explanation that he believed his FSB

account was closed so they shifted to his and her Spiro accounts which had some social security income.  The Trustee's examination of her account confirmed that some funds she received from Othel were used in farming operations.  The existence of her account was revealed to Trustee early on in the case.

Unlike the facts of *In re Wagner*,[56] cited by Pinnacle, Othel was not a named co-owner on Kay's Spiro account who removed his name from her account shortly before filing bankruptcy in an attempt to keep it out of his bankruptcy estate, nor were his social security payments or proceeds from farm operations deposited directly into her account.  The Court does not believe the Gambles to be remotely similar to the debtor in *Wagner*, whom the trial court described as "an individual who will say virtually anything the situation seems to require."[57]  Nor does the Court find any similarity between the Gambles and the debtor in *In re Gordon*.[58]  Debtor Gordon was convicted on criminal charges regarding securities fraud, and was described as "a sophisticated businessman, attorney, and CPA" who "surely understood the implications of filing a bankruptcy petition."[59]  He omitted numerous assets, including financial accounts, and interests in companies in which he was an officer or director, and was anything but an honest and unfortunate debtor.  The trial court found that his business transactions were specifically designed to defraud his creditors.  Having personally observed the Gambles at trial, the Court finds no such intent in this case to make a false oath knowingly and fraudulently.

---

[56] *Wagner v. Wagner (In re Wagner)*, 492 B.R. 43 (Bankr. D. Colo. 2013), *aff'd,* 527 B.R. 416 (10th Cir. BAP 2015).

[57] *Wagner*, 492 B.R. at 48.

[58] *Wieland v. Gordon (In re Gordon)*, 526 B.R. 376 (10th Cir. BAP 2015).

[59] *Gordon,* 526 B.R. at 384.

Othel's records revealed where he deposited monies from crop insurance payments, and identified the source of deposits into his accounts and G&G's account. He promptly responded to requests for information from the Trustee, assisted the Trustee in locating assets, turned over all bank statements from his and Kay's accounts, financial records prepared by his accounting firm, BKD, and provided his parents' trust documents to the Trustee.[60] The Court finds him to be an honest, credible witness, and an unfortunate debtor. He certainly was not reckless with or indifferent to the truth. He used all funds available to fund his farming operation. Having reviewed his testimony and the documentary evidence in detail, the Court finds that Othel provided a satisfactory explanation that his omissions were not intentional but simply inadvertent or based upon a mere mistake. Any deposit of funds into Kay's account was not made to hinder, delay or defraud creditors, but rather to keep the farming operations afloat and generate income to pay his creditors. The Court finds that he did not knowingly or fraudulently omit information from his bankruptcy schedules, nor does the Court believe there was any intent to deceive his creditors.

### 5. § 727(a)(5): failure to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities.

A discharge may be denied if the debtor has failed to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities. A creditor's burden is to prove facts establishing that a loss or shrinkage of assets actually occurred. It does not need to demonstrate

---

[60] *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1991) ("No inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud." (italics omitted). *See also In re Fink*, 351 B.R. 511, 527 (Bankr. N.D. Ill. 2006) ("Although a debtor cannot necessarily redress a false oath by making a subsequent correction, the fact that a debtor comes forward with omitted material of his own accord is evidence that there was no fraudulent intent in the omission.") (citations omitted).

any fraudulent intent by the debtor. Once it meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.[61] The purpose of § 727(a)(5) is to provide documentation to trace how assets were depleted so that interested parties do not have to speculate as to what happened to a debtor's assets. A debtor must provide some corroboration of his explanation which is sufficient to eliminate speculation as to what happened to his assets.[62] Determining whether an explanation is sufficient is left to the sound discretion of the court.[63]

Othel provided numerous bank records detailing expenditures. He attached his tax return to his bankruptcy petition. He also produced documentation regarding the payment of insurance proceeds. He explained that everything he earned was invested back into his farming operations or spent on living expenses. He cashed in life insurance to pay bills. It appears to the Court that Othel fully disclosed, documented and explained the events that led him to file bankruptcy. As a farmer, he had no control over the weather. His farming operations suffered from multiple years of drought only to be followed by a year where he suffered not one, but three floods. The Court is not convinced that Othel has hidden or improperly shielded assets from his creditors. Instead, the Court believes Othel's efforts were focused on keeping his farm operating, generating income so that he could pay his creditors, and making a living. He did have assets that were liquidated for the estate. He substantiated his expenses by opening his checkbook and providing bank statements. Othel's explanation of what happened to income, and his inability to generate

---

[61] *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[62] *See Grassman v. Brown (In re Brown)*, 570 B.R. 98, 118 (Bankr. W.D. Okla. 2017) (citations omitted.). *See also Ritchie,* 543 B.R. at 324-25.

[63] *Martinez v. Sears (In re Sears)*, 565 B.R. at 192 (citing *Potts*, 501 B.R. at 726, and cases cited therein.)

sufficient income to meet expenses was plausible, reasonable and credible to the Court.

Therefore, the Court finds no cause to deny discharge under § 727(a)(5).

**B.    Exception to Discharge  under 11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation, or Actual Fraud**.

As with denials of discharge under § 727, exceptions to discharge must be construed strictly against a creditor and liberally in favor of the debtor, to effectuate the Bankruptcy Code's purpose of giving the honest but unfortunate debtor a fresh start.[64]  The party seeking to except a debt from discharge bears the burden of proving its claims by a preponderance of the evidence.[65]

Pinnacle asserts that Othel's debt should be excepted from discharge under § 523(a)(2)(A) as money obtained by false pretenses, a false representation, or actual fraud.[66]  To establish that a claim is nondischargeable under this section, the creditor must prove: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable; and (5) the debtor's representation caused the creditor to sustain a loss.[67]

Pinnacle presented no testimony or evidence from its own representatives.  No corporate representative attended the trial.  Pinnacle did not identify any false representation that was made to entice it to extend monies or credit to the Gambles.  No evidence was presented that the Gambles submitted false financial information, made false assurances of ability to pay, or similar conduct.  No evidence was presented that the Gambles made any representation with an intent to

---

[64]*Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval)*, 541 F.3d 997 (10th Cir. 2008).

[65]*See Grogan*, 498 U.S. at 291.

[66]Pinnacle did not address its claim under § 523(a)(2)(A) in its post-trial brief.

[67]*Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996).

deceive Pinnacle.  No evidence was presented regarding Pinnacle's reliance on a representation, nor how it made a decision to sell its products or extend credit to the Gambles.  Its proof of claim and judgment reflects that Pinnacle sustained a loss, but there is no evidence that the loss was caused by a false representation or fraud by either of the Gambles.  The Court finds that Pinnacle failed to meet its burden to except its debt from discharge under § 523(a)(2)(A).

## IV.  <u>Conclusion</u>

For the reasons stated above, the Court finds that Pinnacle did not meet its burden of proving that Othel Gamble's discharge should be denied under 11 U.S.C. § 727.  The Court also finds that Pinnacle failed to provide any evidence that its debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).  Accordingly, the Court will enter judgment in favor of Defendant Othel  H. Gamble, Jr. and grant his discharge.

A separate judgment shall be entered in accordance with this Opinion.

###